FILED

07/28/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 6, 2016

**ANTONIO DOCKERY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 09-06080      Chris Craft, Judge**

_____

**No. W2016-01239-CCA-R3-PC**
_____

The Petitioner, Antonio Dockery, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his convictions of aggravated assault and stalking and resulting effective sentence of fourteen years in confinement. On appeal, the Petitioner raises various claims of ineffective assistance of counsel and prosecutorial misconduct. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Antonio Dockery, Pro se, Henning, Tennessee.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Chris Lareau, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In September 2009, the Shelby County Grand Jury indicted the Petitioner for aggravated kidnapping in which the victim suffered serious bodily injury on May 16, 2009; aggravated assault involving the use or display of a deadly weapon on May 16, 2009; and stalking the victim between July 2008 and May 16, 2009. In its opinion of the Petitioner's direct appeal of his convictions, this court gave the following factual account of the crimes:

All three of the [charges] arose after incidents that occurred during [Appellant's] relationship with the victim, Erica Craft. Appellant and the victim first started dating in 2006. Shortly thereafter, Appellant moved in with the victim at her residence on Percy Road. The victim had four children. Appellant is the father of the victim's daughter who was born on December 26, 2008.

On July 31, 2008, the victim called the police after coming home from work to find Appellant at the house with four or five of his friends. At the time, the victim was pregnant. She asked Appellant to ask his friends to leave the house. Appellant became angry, was "in a rage" and proceeded to curse at the victim and call her names. The victim was scared and threatened to call the police. Appellant told the victim he would "beat" her. Appellant left when the victim called the police.

When the police arrived, the victim provided a written statement outlining Appellant's threats. Officer John Granberry with the Memphis Police Department responded to the call. The victim was "really upset and screaming, crying . . . ." However, she assured the police that she felt safe staying at the home. The police were unable to locate Appellant at that time. The victim refused an offer of transport from the police because Appellant reportedly "left without the key." The police had the victim fill out a "hold harmless form." Appellant later called the victim to apologize, telling her he was "sorry for getting . . . carried away and he didn't mean any harm." Appellant was allowed to return to the residence.

On February 6, 2009, Appellant and the victim got into another argument. During the argument, the victim left the home with her children. After she left the house, she realized that she forgot the baby formula at the house. She returned home, leaving the children in the car in the driveway. She entered the kitchen through the side door. Appellant closed the door behind the victim and prohibited her from leaving the house. According to the victim, Appellant "pushed" her against the door and "choked" her while the children were still outside in the car. Appellant told a friend standing outside to bring the children into the house. The friend brought the children into the house. The victim said Appellant was "going crazy"; she told Appellant she was going to call the police. Appellant left the house but returned before police arrived. According to the victim, Appellant was "in a rage" and did not hit her but "raised his arm up" hitting the light fixture in the kitchen. The light fixture fell and hit Appellant on the head. Appellant ran from the house "screaming and hollering" and called his sister to come

- 2 -

pick him up at the house. The victim managed to call 911 twice during this altercation.

Officer Alvin Clark with the Memphis Police Department responded to the domestic violence call. When he arrived, the inside of the home showed "disarray." The victim was shaking and "very excited." The police noticed blood droplets at the scene. The victim explained that the blood belonged to Appellant. The police took pictures of the marks around the victim's neck. The victim's bruises took about a week to go away.

The victim wrote a statement describing the incident. She stated the following:

> I walked in the door. [Appellant] then closed the door behind me, locked it, and started to choke me saying, I'm going to give you what you want. He then choked me again and pushed me down and picked me up to choke me again, threw me against the wall, pushed me down and kicked my side and tried to hit me. But . . . when he raised his arm, he broke the light fixture. It fell and busted his head and then he called his sister to come and take him to the hospital. Before he left, he threw the phone-he threw my phone out [of] his pocket. He took it during the fight so I couldn't call the police. And took my rent money, $550, and left.

The victim declined transportation by police to another location. She informed authorities that one of her relatives would come to stay with her at the house.

Appellant later called and apologized for his behavior. He explained that he was angry because he thought the victim was with another man when she left to go to her mother's house. Again, the victim believed that Appellant was sincere in his apology and let him back into the house.

In April of 2009, the victim finally left the relationship. She moved to Mississippi with her children to stay with a cousin. The victim called Appellant from Mississippi to tell him that their relationship was over and that she wanted to "move on." The victim wanted to get along with Appellant in the future because of their daughter. She informed Appellant that she had a new boyfriend. On April 19, 2009, the victim and her new boyfriend, Curtis, were at the victim's mother's house in Memphis picking

up the victim's daughter. Curtis waited in the car in the driveway. He saw Appellant pull in to the driveway and then pull out of the driveway. The victim got back into the car with her daughter and Curtis. As they left her mother's house, the victim saw Appellant driving up the street. He was holding out his hand in an attempt to get the victim to stop her car. The victim kept driving. Appellant drove up behind the victim and tried to make her pull over. He even rolled down his passenger-side window, trying to get the victim to pull over. The victim sped up to get in front of Appellant, and he pulled in behind her and "rammed into the trunk of [her] car." Appellant used his vehicle to push the victim's car, causing her car to fishtail.

When the victim got to the red light, Appellant "rammed [her car] again through the light." In order to avoid being in the intersection, the victim had to "hit the gas" and get out of the intersection because the light was red. As Appellant drove away, he hollered, "I'll catch you later, bitch. And I'll whip your ass." Appellant also threatened to "shoot [Curtis]" in the face.

The victim called the police again to report Appellant's behavior and then stopped at the police precinct on Raines Road. Officer Lee Walker was on duty that night. He heard a knock on the door. When Officer Walker answered the door, the victim was outside, "visibly upset" and crying. The victim had her daughter with her that night. The victim reported the assault, telling Officer Walker about Appellant's erratic behavior. Officer Walker observed the damage to the victim's vehicle and had the victim fill out a hold harmless form. The victim issued another statement in which she claimed:

> [M]y ex-boyfriend saw me driving past him and tried to stop me but I didn't stop. He then followed me, rammed the back of my car, and tried to make me wreck. My daughter was in the car with me also . . . . He pushed us through a red light and then hung out his window with a gun saying he was going to shoot me in the face.

An officer escorted the victim to the Mississippi state line.

The victim later obtained an ex parte order of protection against Appellant on April 22, 2009. The order "restrained and prohibited [Appellant] from abusing, threatening to abuse, or committing acts of

- 4 -

violence upon [the victim]." The order was entered by the trial court on May 6, 2009, and set for a hearing on May 19, 2009. The order of protection was served on Appellant on May 19, 2009. Following a hearing on the ex parte order, a one-year order of protection was issued. The order prohibited Appellant from calling, contacting, or otherwise communicating with the victim "directly or indirectly." It also prohibited Appellant from coming to the victim's place of employment or residence for any purpose. Appellant was also prohibited from "possessing, shipping, receiving, or transporting a firearm or ammunition."

The victim had to pay to replace the bumper on her car and to prime and paint the trunk after Appellant's actions.

On May 1, 2009, the victim and her children moved into a house on East [Biscayne] in Shelby County. On May 15, 2009, Appellant called the victim and made plans to pick up his daughter.

Appellant did not show up to pick up the child but later called the victim and asked her to go downtown with him to talk about visitation arrangements. The victim complied. When the victim and Appellant returned to the victim's house, she allowed Appellant to come inside and watch television. The victim fell asleep on the couch. While she was asleep, Appellant looked through her phone. When the victim woke up, Appellant was "trying to have sex" with her. The victim refused. Appellant started yelling and screaming at the victim; he accused her of sleeping with another man and read some of the victim's text messages to Curtis. Appellant pushed the victim down a hallway and into her daughter's bedroom. Appellant hit the victim in the face. As a result, she fell onto the bed. Appellant told her he was "fixing to beat [her]."

At that point, Appellant got on top of the bed. He stomped the victim in the face, kicked her in the chest, and hit her in the face with his fist. The victim tried to cover her face during the ordeal. Appellant told the victim he was "fixing to kill [her]" as he continued to read text messages from the victim's phone. Appellant eventually pushed the victim back on the bed and left the room "screaming" and "hollering."

The victim got into the corner of the room because there was no way to leave the room. Appellant entered and exited the room several times. She then heard Appellant open the front door. Then she heard him close it

and lock it. The victim could not leave the house after Appellant left the bedroom because there was only "one way in, one way out."

Appellant came back into the room at some point and pushed the victim back onto the bed. Appellant grabbed a steel lamp and hit the victim in the temple on the right side of her head. The victim fell down, and Appellant hit her again. Appellant picked up a television. The victim begged him for her life after Appellant told her he was going to kill her. Appellant put the television down and instead hit the victim with his fists. He broke her nose.

The victim promised that she would not call the police. He instructed her to clean herself up, especially her face. Appellant left the house shortly thereafter. The victim was able to run to the front door and lock it. She was unable to find her car keys or her cell phone. Appellant stood outside the house at the window watching her and yelling at her. The victim felt as though she was unable to leave her own home.

The victim waited until Appellant left in his truck before she went outside. Her car keys and cell phone were on the front lawn. The cell phone battery was broken. The victim was able to drive her car to her mother's house [on Jeff Drive] where she called the police. The victim first reported that Appellant followed her home from the gas station. She later admitted that this was not true. She lied because she did not want her family to know that she was still talking to Appellant.

Officer Kebena Cash of the Memphis Police Department responded to the residence on Jeff Drive the night of May 16, 2009. Upon [his] arrival, [he] noticed the victim had suffered injuries to her face and nose. The victim was "shaking" and "afraid." The victim's statement revealed the following:

> [Appellant] followed me home . . . [he] pushed me down the hallway into my daughter's room and he pushed me on [the] bed. He then stood over me and began to . . . punch me . . . with his fist in my face. He started to kick me and punch me in my face. He picked up a lamp and struck me in my face with it. He locked the doors and took my cell phone so I couldn't call anyone.

The victim suffered injuries as a result of Appellant's behavior, specifically, bruises on her nose, chest, face, and arms. The victim also had a broken nose, swollen mouth, and knots on her head. The victim was unable to work for two weeks as a result of Appellant's behavior.

Appellant was located by authorities hiding in the attic of a residence at an address provided by the victim. When the officers approached Appellant, he claimed he "didn't do anything to her. I'm sure she done made something up." After being arrested, Appellant became belligerent, shouting threats and insisting he would "get" the victim when he got out of jail. Appellant even slammed his fists against his hands.

State v. Antonio Dockery, No. W2012-01024-CCA-R3-CD, 2014 WL 172379, at *1-5 (Tenn. Crim. App. at Jackson, Jan. 15, 2014) (footnote omitted), perm. app. denied, (Tenn. May 14, 2014). The jury convicted the Petitioner as charged, and the trial court sentenced him to twenty years for aggravated kidnapping, fourteen years for aggravated assault, and eleven months, twenty-nine days for stalking. Id. at *5. The court ordered that the Petitioner serve the twenty- and fourteen-year sentences consecutively for a total effective sentence of thirty-four years. Id.

On direct appeal of his convictions, the Petitioner claimed that the evidence was insufficient to support his conviction of aggravated assault because the lamp was not a deadly weapon; that the evidence was insufficient to support the conviction of aggravated kidnapping because it failed to show he knowingly confined the victim or substantially interfered with her liberty; that the trial court improperly instructed the jury on aggravated kidnapping as required by State v. White, 362 S.W.3d 559, 576 (Tenn. 2012); that his convictions of aggravated assault and stalking violated double jeopardy; and that the trial court violated Tennessee Rule of Evidence 404(b) by admitting evidence of prior assaults to support the stalking conviction. See id. at *5-15. This court affirmed the convictions of aggravated assault and stalking but determined that the trial court committed reversible error by failing to instruct the jury pursuant to White. Id. at *11, 16. Accordingly, this court reversed the Petitioner's aggravated kidnapping conviction and remanded the case for a new trial on that offense. Id. at *12. At the victim's request, the State decided not to proceed with a new trial, leaving the Petitioner with a fourteen-year sentence to be served as a Range III offender.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely pro se petition for post-conviction relief, alleging six main issues: (1) that he was denied the effective assistance of counsel because trial counsel waived his preliminary hearing without his consent; (2) that he was denied the effective assistance of counsel because trial counsel failed to conduct an adequate investigation

and prepare a viable defense theory; (3) that he was denied the effective assistance of counsel because trial counsel instructed him not to testify; (4) that the State violated his right to due process by making extraneous, false, and misleading comments during its opening statement and throughout trial; (5) that the State violated his right to due process by presenting false evidence and testimony at trial; and (6) that he was denied the effective assistance of counsel on direct appeal of his convictions due to "inadequate briefing." Within each main issue, the Petitioner raised numerous sub-issues. The post-conviction court appointed counsel, and counsel did not file an amended petition for post-conviction relief.

The post-conviction court held four evidentiary hearings in 2015. During the first hearing on May 5, post-conviction counsel advised the court that the Petitioner was "dissatisf[ied]" with counsel's representation and that counsel was "really here as elbow counsel." Counsel then called the Petitioner to the stand and questioned him about his pro se petition.

The Petitioner testified that post-conviction counsel wanted to file an amended petition for post-conviction relief and that he researched the two issues counsel wanted to raise. The first issue already had been determined by this court, and the second issue "was already in a consolidated petition." Therefore, the Petitioner decided to rely on the issues he raised in his pro se petition.

The Petitioner testified that he retained trial counsel and that counsel waived his right to a preliminary hearing without his consent. The Petitioner said he should have had a hearing because "they" would have seen that his case was based on lies, not probable cause. The Petitioner was on bond while awaiting trial and talked with trial counsel at counsel's office several times. He told trial counsel that the police arrested him without a warrant at the home of his then-girlfriend, Artricia Polk. However, trial counsel was "totally nonchalant about the whole deal" and should have challenged the illegal search and arrest. Trial counsel also should have interviewed the Petitioner's alibi witness, Polk. Trial counsel told the Petitioner that "no defense will be the best defense" and did not file any pretrial motions. The Petitioner said counsel should have filed a motion for a bill of particulars and a notice of alibi. Trial counsel also failed to challenge the State's introduction of 911 calls involving previous assaults on the victim; failed to cross-examine the victim effectively after she gave inconsistent testimony on direct examination; and failed to object to the State's "ambush" witnesses, who were not listed on the indictment.

The Petitioner testified that before trial, he and counsel discussed whether he should testify and that counsel told him the jury would find him guilty, "at a maximum," of simple assault. Trial counsel told the Petitioner that he could testify, and the Petitioner

planned to do so. After the State rested its case, though, counsel advised him not to testify. When the jury convicted the Petitioner, he realized he had made a mistake by not testifying.

The Petitioner acknowledged that his pro se petition alleged the State made "extraneous, false, and misleading statements" during its opening statement and throughout trial. However, the Petitioner never had access to a transcript of opening statements because the attorney who represented him in his motion for new trial never requested the transcript. The State also introduced "unfounded and unindicted charges" into evidence in violation of Tennessee Rule of Evidence 404(b). Specifically, the State introduced evidence that the Petitioner had been arrested for, but not convicted of, intimidation in 2008, assault in 2009, and attempted murder in 2009. Trial counsel did not object to the improper evidence, request a curative instruction, or request a mistrial. The Petitioner raised the issue in his motion for new trial, but appellate counsel did not raise the issue on direct appeal of the Petitioner's convictions.

The Petitioner acknowledged that his pro se petition also alleged the State presented false evidence and testimony at trial. For example, the State introduced into evidence a photograph of the lamp allegedly used by the Petitioner to assault the victim in her home on East Biscayne; however, the photograph was actually taken of a lamp that was in the residence on Jeff Drive. The victim testified falsely about the lamp, and counsel should have made her false testimony clear to the jury.

The Petitioner alleged in his petition that the State misled the jury regarding an order of protection that was issued against him. He testified that the order was issued on May 19, 2009, three days after he allegedly assaulted the victim. Therefore, the order of protection was irrelevant to the crimes for which he was on trial. Nevertheless, the State introduced the order of protection into evidence at trial, and counsel did not object or raise the issue on direct appeal of the Petitioner's convictions.

The Petitioner testified that after the jury convicted him, he retained new counsel to represent him at sentencing and for his motion for new trial. Newly-hired counsel failed to "perfect" the Petitioner's motion for new trial and failed to address in the motion another double jeopardy claim, the false evidence presented by the State, incorrect jury instructions, and improperly admitted photographs of the victim's injuries. After the trial court denied the Petitioner's motion for new trial, the court appointed appellate counsel for the direct appeal of the Petitioner's convictions. Appellate counsel failed to "perfect" the Petitioner's appellate brief and failed to raise as error that the trial court improperly instructed the jury on the improperly admitted photographs.

At the conclusion of the Petitioner's testimony, he stated that he wanted to add several issues to his petition for post-conviction relief. First, the State referred to the Petitioner's prior bad acts during its opening statement, and trial counsel failed to object. Second, the trial court "chastised" the Petitioner in front of the jury during opening statements. The Petitioner requested that the post-conviction court have the opening statements and closing arguments transcribed and made part of the post-conviction record. At that point, the post-conviction court, which was also the trial court, noted that the Petitioner "was misbehaving [during opening statements], and I asked him not to, and the jury was present." The post-conviction court stated that it would be "glad" to have the opening statements and closing arguments transcribed and made an exhibit at a later date. Finally, the Petitioner claimed that the State improperly advised the jury during its closing arguments "to discard [the victim's] lie" and that trial counsel made impermissible comments during closing arguments by "putting [the Petitioner] on the scene of a crime that [he] never was at."

On cross-examination, the Petitioner acknowledged that he hired trial counsel to represent him, that trial counsel had represented him previously, and that he was satisfied with trial counsel's prior representation. He also acknowledged having numerous prior "dealings" with the criminal justice system. The State asked if the Petitioner knew his case was set for a July 10, 2009 preliminary hearing. He said counsel told him that his case was going to be "reset" and that "you'll get your court date in the mail." The Petitioner said he thought his case had been dismissed but that the State might indict him "or something."

The Petitioner testified that he met with trial counsel two or three times in person before trial but that they primarily communicated about his case on the telephone. During jury selection, the Petitioner told trial counsel that Artricia Polk was willing to testify that he was home with her at the time of the alleged assault and kidnapping on May 16. He said he did not subpoena her to the post-conviction hearing because he "wouldn't dare put nobody up on this stand to be criticized and chastised by this courtroom."

The Petitioner acknowledged that trial counsel received discovery and provided him with a copy of discovery materials. He also acknowledged that trial counsel told him information about his prior felony convictions would "come out" if he testified. During a jury-out hearing at trial, the Petitioner told the trial court that he chose to follow counsel's advice and not testify. After trial, though, he wished he had testified.

The Petitioner testified that during opening statements, the prosecutor told the jury that the Petitioner had been arrested for prior incidents involving the victim in July 2008, February 2009, and April 2009, which was "a lie" because he was not arrested until May

16, 2009. The Petitioner acknowledged that he made objections "out loud" to the prosecutor's opening statement and that his objections were inappropriate. He said he continued to make objections "[d]ue to prosecutorial misconduct." The Petitioner said that the trial court "instructed" him twice in front of the jury. The court then had the jury step out of the courtroom and advised the Petitioner that he would have to be quiet in order to remain in the courtroom. The Petitioner agreed to be quiet.

The State asked the Petitioner if he understood that proof of the prior assaults was necessary in order for the State to prove the stalking charge. He answered that the victim testified she lied about the stalking; therefore, the trial court should have held a Rule 404(b) hearing to determine whether evidence of the other assaults was admissible. He said that appellate counsel raised only one double jeopardy claim but that there were two claims. The second claim involved an improper jury instruction concerning the jury's consideration of the February 2009 incident as evidence of the May 16, 2009 assault.

The Petitioner testified that during closing arguments, trial counsel told the jury that "I don't know what happened in that house . . . [on] Biscayne" and that the victim should have died if what she claimed was true. The Petitioner said that counsel's argument was improper because it put him at the crime scene when he was never there and that counsel's argument sounded like counsel was representing the victim.

On June 11, 2015, the post-conviction court held a second evidentiary hearing. At the outset of the hearing, post-conviction counsel announced that the Petitioner wanted to call the prosecutor to testify and that the Petitioner had prepared a multi-page list of questions he wanted post-conviction counsel to ask the prosecutor. Counsel stated that he thought the questions were "totally inappropriate and totally irrelevant" and that he was asking the court "for some guidance." The court answered that the Petitioner had a right to call witnesses, confront them, and ask questions; therefore, post-conviction counsel needed to ask the questions, and the court would rule on them if the State objected. The State objected to many of the questions, and the post-conviction court sustained most of them.

Nevertheless, the prosecutor was allowed to testify that she had been employed by the Shelby County District Attorney's Office since 2006 and represented the State at the Petitioner's trial. The State did not retry the Petitioner for aggravated kidnapping because the victim did not want to testify again. The prosecutor stated that she talked with the victim several times and that "[u]ltimately, that was [the victim's] decision." She said that the Petitioner's stalking charge was based on several incidents and that a defendant's sharing a lease or living with a victim did not preclude the defendant from being guilty of stalking. The victim had obtained an order of protection against the Petitioner, and he should not have been near her.

The prosecutor testified that she did not coerce the victim. The victim told the prosecutor that the victim had lied to the police on May 16, 2009, by telling them the Petitioner had followed her home. The victim said she lied because she did not want her mother to know she had allowed the Petitioner to spend the night. The victim cried when she told the prosecutor about the lie, and the prosecutor reported the lie to trial counsel. The victim told the jury on direct examination that she lied to the police, and trial counsel cross-examined the victim "vigorously" about the lie. During the victim's redirect examination testimony, she explained to the jury that she lied because she did not want her family to be upset with her. During closing arguments, the prosecutor told the jury to find the Petitioner guilty as charged because the victim was truthful on the stand and because the victim explained to the jury why she had been untruthful to the police. Photographs showed the victim's injuries, and the prosecutor believed the victim had been truthful about being stalked by the Petitioner. The prosecutor said she not think a comment to the jury that the victim had no reason to lie was improper.

On cross-examination, the prosecutor testified that she handled the Petitioner's preliminary hearing on July 10, 2009. The victim was present and ready to testify, but the Petitioner chose to waive the hearing. An ex parte order of protection against the Petitioner had been issued on May 6, 2009, and the prosecutor had a copy of the order added to the Petitioner's case file during the hearing.

The prosecutor testified that she addressed the victim's lie to the police "head-on" at trial. The prosecutor thought the victim was truthful about all the other incidents, and photographs of the victim's injuries supported the victim's testimony. The State rested its case against the Petitioner in the afternoon, and the trial court recessed the trial overnight so that the Petitioner could assess the State's proof and talk with trial counsel about testifying. The next morning, the trial court held a <u>Momon</u> hearing. During the hearing, the trial court questioned the Petitioner, and the Petitioner said it was his decision not to testify. The prosecutor said that the Petitioner had prior felony convictions and that she would have impeached him with the convictions if he had testified.

Trial counsel testified for the Petitioner that he had been an attorney for more than thirty years. He said he represented the Petitioner at the preliminary hearing, which was waived, and that "I don't know how I could have waived it without his consent." The Petitioner complained to trial counsel that he had been arrested without a warrant, and counsel told him that the police did not necessarily need a warrant for an arrest. Counsel said that he did not think the manner in which the Petitioner was arrested had anything to do with the Petitioner's case and that he did not challenge the arrest because the police had probable cause to arrest the Petitioner.

- 12 -

Trial counsel acknowledged that the trial court admonished the Petitioner in front of the jury. Counsel said he did not request a mistrial because he did not think the court would grant a mistrial for the Petitioner's own behavior. He said he did not remember the Petitioner's mentioning an alibi or Artricia Polk to him. The Petitioner did not think the victim would show up for trial. When trial counsel learned the victim had lied to the police, he "tried to really focus on that area" and use it to argue she lied about "the whole thing."

Trial counsel testified that he did not make an opening statement at trial. He explained that the Petitioner did not give him the names of any witnesses, so counsel did not have any witnesses to refute the State's opening statement. He said that in his thirty years of practicing law, he had not made an opening statement in only three or four cases.

Trial counsel testified that the State provided him with all of the discovery materials in the case and that he was sure he objected to the State's introduction of prior bad acts. He said he did not know if he objected to the State's introducing the order of protection into evidence but that the order did not specify any wrongdoing by the Petitioner. Trial counsel probably did not object to the State's introducing the 911 calls into evidence because the calls were admissible as an exception to the hearsay rule. Regarding trial counsel's stating during his closing argument that the Petitioner was at the Biscayne address and that the victim should have died, counsel said, "It was just part of my closing." He acknowledged that the Petitioner had filed many complaints against him.

On cross-examination, trial counsel testified that he represented the Petitioner until the Petitioner's sentencing hearing. He acknowledged that he would have discussed the "pros and cons" of waiving a preliminary hearing with the Petitioner and that it was not unusual to waive a hearing. One of the reasons to waive a hearing was to "preserve" a defendant's bond. A defendant had to "sign the papers" to waive the hearing, and the Petitioner signed the waiver in this case and remained on bond pending trial. The Petitioner's trial originally was set for September 9, 2009. However, the Petitioner did not show up for trial, was arrested, and remained in custody. Although the Petitioner did not think the victim would show up for trial, trial counsel had spoken with her and told the Petitioner that he thought the victim would cooperate with the State. Trial counsel acknowledged that the victim's lie to the police was a "strong point" for the defense and that he vigorously cross-examined her.

Trial counsel denied promising the Petitioner a specific outcome at trial. He said that the Petitioner had a couple of "outbursts" during the trial and that "[a]t that point I told him he probably lost our trial." The trial court admonished the Petitioner in front of

- 13 -

the jury, and the Petitioner "calmed down after the second time."  Counsel and the Petitioner discussed the Petitioner's right to testify.  However, counsel was concerned about the Petitioner's criminal history and whether the Petitioner could "handle himself" on the stand.  The Petitioner chose not to testify.

The trial court held a third hearing on July 9, 2015.  During the hearing, the Petitioner acknowledged that he was testifying in order to refute the testimony of the prosecutor and trial counsel.  Regarding trial counsel's testimony, the Petitioner testified that trial counsel was not adequately prepared to defend him because counsel failed to file any motions, "bring out" inconsistencies in the testimony of the State's witnesses, or conduct a Rule 404(b) hearing regarding prior bad acts.  The Petitioner stated that despite the fact that trial counsel "got up here and testified" that he objected to 404(b) evidence, this court noted in its opinion of the direct appeal of the Petitioner's convictions that trial counsel did not object.  The State also was allowed to introduce exhibits one and two regarding prior bad acts into evidence.  The Petitioner stated that trial counsel should have compared the victim's "prior reports" to her trial testimony in order to impeach the victim.  For example, the victim had claimed that the Petitioner said he was going to kill her; however, she testified on direct examination that she never made such a claim.

Regarding the prosecutor's testimony, the Petitioner testified that the prosecutor used false evidence, perjured testimony, prior bad acts, and a "[f]ake lamp" to convict him.  She also used the testimony of the police officer who arrested him on May 16 to mislead the jury and used the victim's lies to deceive the jury.

The Petitioner testified that his second attorney, who represented him at his sentencing and motion for new trial hearings, was ineffective because the attorney "did not file for a complete trial transcript to inspect for reversible errors"; did not raise an issue regarding Tennessee Rule of Evidence 404(b); and included "a lot of frivolous claims" in the Petitioner's motion for new trial.  At the conclusion of the Petitioner's testimony, the post-conviction court scheduled a fourth evidentiary hearing so that appellate counsel and Officer Kebena Cash could be subpoenaed.

During the fourth hearing on September 1, 2015, the Petitioner advised the post-conviction court that he needed Officer Cash and appellate counsel to testify in order to refute the prosecutor's testimony.  He said that although he had not talked with Officer Cash, Officer Cash would testify that he was unaware of the lamp introduced into evidence and that the alleged weapon was not found at the crime scene.  Post-conviction counsel advised the court that Officer Cash was no longer with the Memphis Police Department, and the court asked if the Petitioner knew how to locate the officer for a subpoena.  The Petitioner said no but that he was looking for Officer Cash.  Regarding appellate counsel, the Petitioner stated that appellate counsel would "testify to the

misstatement of facts that he stated concerning the claim that should have been brought up that he didn't bring up."

The post-conviction court stated that Officer Cash could not be subpoenaed because he could not be located. The court noted that appellate counsel had moved out of Tennessee but stated that it did not need appellate counsel's testimony because "the facts which the defendant . . . says would force [appellate counsel] to admit that he was wrong are self-evident."

More than seven months later, on April 8, 2016, the post-conviction court filed an order denying the petition for post-conviction relief. In the order, the court addressed seven allegations of ineffective assistance of counsel and five allegations of prosecutorial misconduct. Concerning the claims of ineffective assistance of counsel, the court rejected the Petitioner's claims that counsel was ineffective for waiving the preliminary hearing, failing to investigate the case and present an alibi defense, failing to challenge the admissibility of the 911 calls played at trial, failing to cross-examine the victim effectively, advising the Petitioner not to testify, failing to emphasize to the jury that the victim admitted making false allegations against the Petitioner and tried to hide their relationship from her mother, and failing to raise issues on appeal. Regarding the claims of prosecutorial misconduct, the court rejected the Petitioner's claims that the State improperly discussed the Petitioner's prior bad acts during opening statement and closing arguments, introduced false evidence at trial, misled the jury regarding the order of protection, "ambushed" the Petitioner by calling five witnesses not listed on the indictment or disclosed pretrial, and failed to disclose exculpatory evidence.

## II. Analysis

The Petitioner maintains that he received the ineffective assistance of counsel and that the State committed prosecutorial misconduct. The State argues that the Petitioner has failed to show that he is entitled to relief. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are

entitled to substantial deference on appeal unless the evidence preponderates against those findings.  See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

## A.  Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).  We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct.  See Fields, 40 S.W.3d at 458.  However, we will review the post-conviction court's conclusions of law purely de novo.  Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense."  Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).  To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases."  Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  Generally,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.  Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

First, the Petitioner contends that trial counsel was ineffective for failing to investigate his warrantless search and seizure and by waiving his preliminary hearing without his consent.  The post-conviction court accredited trial counsel's testimony that he saw no basis for filing a motion to suppress and concluded that challenging the Petitioner's warrantless arrest "would have done [him] no good" because the police had probable cause to arrest him without a warrant.  The trial record supports the conclusion of post-conviction court in that it shows Officer Cash arrested the Petitioner on May 16, 2009, based upon the victim's report to Officer Cash that the Petitioner had punched and kicked her and Officer Cash's observing injuries to the victim.  See Beck v. Ohio, 379

- 16 -

U.S. 89, 91 (1964) (providing as an exception to the warrant requirement that an officer has probable cause to believe a defendant has committed a crime). Moreover, Officer Cash testified at trial that when he arrived at the Petitioner's girlfriend's home, she consented to his searching the residence. The post-conviction court noted, and the trial record confirms, that no evidence was seized from the Petitioner or the home during his arrest. Regarding the waiver of the Petitioner's preliminary hearing without his consent, the post-conviction accredited trial counsel's testimony that the Petitioner personally waived the hearing. Nothing preponderates against the finding of the post-conviction court. Thus, the Petitioner is not entitled to relief.

Next, the Petitioner contends that trial counsel was ineffective for failing to challenge the 911 calls played for the jury because the calls were prior bad acts prohibited by Tennessee Rule of Evidence 404(b). However, the trial record shows that the Petitioner's stalking charge was based on the incidents that occurred on July 31, 2008, February 6, 2009, and April 19, 2009. During trial, the State played a recording of two 911 calls made by the victim after the Petitioner assaulted her on February 6, 2009. The calls were relevant to the stalking charge under Tennessee Rule of Evidence 401 and, as found by the post-conviction court, admissible under Tennessee Rule of Evidence 803(2), the exception to the hearsay rule for excited utterances. Thus, counsel was not ineffective for failing to object to the calls.

The Petitioner contends that trial counsel was ineffective for failing to cross-examine the victim effectively regarding her lying to the police, her lying about the Petitioner's hitting her with the lamp, and discrepancies in her direct testimony. However, the post-conviction court accredited trial counsel's testimony that the victim's lie to the police was counsel's main defense. The court found that trial counsel "immediately began impeaching the victim with her prior false statement to the police about a prior assault" and that he continued to attack her credibility for twenty-seven pages of her cross-examination. We have reviewed the victim's cross-examination testimony, and it confirms that counsel thoroughly questioned her about her lie and her continuing to have contact with the Petitioner despite her claim that she was afraid of him. Counsel even asked the victim at one point, "[A]ll this other stuff, it was a lie; is that correct?" Thus, the record supports the post-conviction court's conclusion that counsel was not ineffective.

Next, the Petitioner argues that counsel was ineffective for advising him not to testify and that counsel coerced him not to testify. The post-conviction court accredited trial counsel's testimony that he advised the Petitioner not to testify because he was concerned that the State would impeach the Petitioner with prior convictions and that the Petitioner would be unable to control himself on the stand. The post-conviction court noted that the Petitioner had "created disturbances in prior court settings and had already

- 17 -

lost his temper" during the State's opening statement. We note that the Petitioner admitted at the evidentiary hearing that he inappropriately objected during the prosecutor's opening statement. Regarding the Petitioner's claim that counsel coerced him not to testify, the post-conviction court found that it held a Momon hearing in which it questioned the Petitioner and that the Petitioner said it was his decision not to testify. We have reviewed the hearing, and it supports the post-conviction court's conclusion that the Petitioner knowingly, voluntarily, and intelligently waived his right to testify.

The Petitioner contends that trial counsel was ineffective for failing to object to the prosecutor's improper opening statement and for trial counsel's making improper statements during trial counsel's closing argument. However, the opening statements and closing arguments were not transcribed and included in the record for the direct appeal of the Petitioner's convictions, and they are not part of the post-conviction record. Although the post-conviction court stated that it would be "glad" to have the opening statements and closing arguments transcribed and introduced into evidence as an exhibit at a later time, it did not do so. The Petitioner carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. Tenn. R. App. P. 24(b). Thus, the issues have been waived. See Tenn. R. App. P. 36(a).

The Petitioner contends that trial counsel was ineffective for failing to object to an incorrect jury instruction and for failing to request a "corrective" instruction. He also contends that appellate counsel was ineffective for mentioning the issue in a footnote of the appellate brief instead of raising the issue in the direct appeal of his convictions.

The Petitioner's complaint relates to the victim's testimony about the Petitioner's assaulting her on February 6, 2009. The State sought to introduce into evidence two photographs, i.e., exhibits one and two, showing choke marks around the victim's neck. Defense counsel objected, arguing that the February 6 incident did not constitute stalking. The trial court concluded that the evidence was relevant to the stalking charge but stated that it was going to instruct the jurors that they could not consider the February 6 incident as evidence of count one, aggravated assault, or count three, aggravated kidnapping. However, the court actually instructed the jurors that "you cannot use anything that happened on May the 16th, 2009, to show stalking. You cannot use anything that happened before that date to show aggravated kidnapping or aggravated assault." On direct appeal of the Petitioner's convictions, appellate counsel referred to the trial court's instruction in a footnote but did not raise an issue regarding the instruction. Appellate counsel also argued that evidence of the prior assaults violated Rule 404(b). This court concluded that the Petitioner waived the issue because he failed to object to the victim's testimony about the prior assaults under Rule 404(b) at trial and found no plain error. Antonio Dockery, No. W2012-01024-CCA-R3-CD, 2014 WL 172379, at *14-15.

The Petitioner argues that the trial court's instruction improperly allowed the jury to consider the February 6 assault as substantive evidence of the May 16 aggravated assault and aggravated kidnapping. We disagree. Although the trial court did not specifically instruct the jurors that they could not consider the February 6 assault as evidence of the May 16 aggravated assault or aggravated kidnapping, the court instructed them that they could not consider any assaults that occurred prior to May 16 as evidence of the aggravated assault or aggravated kidnapping. Therefore, the jurors obviously could not consider the February 6 assault in their consideration of the two offenses. Moreover, our review of the final written jury instructions shows that the trial court instructed the jurors that they could only consider assaults that occurred prior to May 16 "for the limited purpose of determining whether it provides proof of an element of stalking as charged in Count Two." Accordingly, trial and appellate counsel were not ineffective regarding the jury instruction.

The Petitioner's final ineffective assistance of counsel claim alleges that the attorney who represented him at sentencing and in his motion for new trial raised frivolous issues in the motion for new trial. Again, we disagree with the Petitioner. Our review of the trial record reveals that counsel filed a motion for new trial, raising the following issues: (1) that the evidence was insufficient to support the convictions; (2) that the verdict was contrary to the law and evidence; (3) that the trial court erred by admitting evidence in violation of Tennessee Rule of Evidence 404(b), specifically the April 19, 2009 incident report regarding the Petitioner's pushing the victim's car through a red light, testimony by General Sessions Clerk Cynthia Chambers regarding the order of protection, and the July 31, 2008 incident report regarding the Petitioner's death threat to the victim; (4) that the State committed prosecutorial misconduct by eliciting testimony that the Petitioner choked, hit, slapped, and held the victim against her will when her testimony revealed he only choked her; (5) that the trial court allowed the indictment to be amended without notice to the Petitioner; (6) that the trial court failed to clarify in the final jury instructions that the acts committed on May 16, 2009, were inapplicable to the stalking charge; and (7) that the trial court failed to clarify in the final jury instructions that the February 6 photographs of the victim's choking injuries applied only to the stalking charge. In our view, none of these issues was frivolous. Regardless, we fail to see, and the Petitioner has not explained, how he was prejudiced by counsel's raising any of the issues. Therefore, he has failed to demonstrate that he received the ineffective assistance of counsel.

B. Prosecutorial Misconduct

First, the Petitioner claims that the State committed prosecutorial misconduct by making statements during its opening statement that testimony later revealed were untrue

and that the State deceived the jury during its closing arguments. However, as explained previously, the Petitioner has waived this issue for failing to include the opening statements and closing arguments in the appellate record. See Tenn. R. App. P. 24(b); 36(b).

The Petitioner argues that the State committed prosecutorial misconduct by introducing into evidence photographs of a lamp that were taken at Jeff Drive, not East Biscayne where the May 16 assault occurred. The Petitioner cites to the following direct examination testimony by the victim in support of his claim:

> Q. This picture right here, what are we looking at in this particular picture?
>
> A. I got hit with the lamp on the side of my face.
>
> Q. Is that the lamp you said? On the side of your face?
>
> A. Yes, ma'am.

Regarding this issue, the post-conviction court stated, "The petitioner mistakenly believes that photographs taken and entered as Exhibits 3, 4, and 5 were pictures of a lamp. They were not. They were pictures of the injuries to the victim that she testified were caused by the lamp." The trial record supports the post-conviction court. We have reviewed all of the photographs introduced into evidence at trial and not a single one shows a lamp. Therefore, we find no merit to this claim.

Next, the Petitioner claims that the State committed prosecutorial misconduct by telling the jury that the May 16 incident occurred after an order of protection had been issued. He contends that the order of protection was issued on May 19, three days after the assault. The post-conviction court found that

> [t]he Order of Protection, entered as Exhibit 10 at the trial, clearly shows that it was granted, signed and filed by Judicial Commissioner Rhonda Harris on May 6, 2009, with a hearing to see whether it would be made permanent to be heard May 19th, after it was served on the petitioner.

We have reviewed the order of protection, and it confirms the findings of the post-conviction court. We note that in this court's opinion affirming the Petitioner's direct appeal of his convictions, we also stated that the order of protection was entered by the trial court on May 6 and set for a hearing on May 19. An ex parte order of protection is

- 20 -

in effect from the time it is issued until the time of the hearing. <u>See</u> Tenn. Code Ann. § 36-3-605(b). Accordingly, we find no merit to this claim.

The Petitioner contends that the State committed prosecutorial misconduct because he was "ambushed" and surprised by five State witnesses who were not listed on the indictment or disclosed before trial. The post-conviction court noted in its order denying relief that trial counsel testified he received full discovery in this case and that counsel never claimed he was surprised by the calling of any State witnesses. Thus, the court found that the Petitioner failed to prove he did not receive the names of the witnesses during discovery. We conclude that the record does not preponderate against the findings of the post-conviction court.

Finally, the Petitioner claims that the State committed prosecutorial misconduct by failing to disclose exculpatory evidence and by allowing State witnesses to give false testimony. The post-conviction court denied relief, stating that "[n]o proof has been offered of any <u>Brady</u> material in any statements of any witnesses." We agree. The Petitioner contends in his appellate brief that his petition contains "lengthy appendices demonstrating the proof" regarding this issue. However, referring this court to the petition for post-conviction relief does not comply with Tennessee Rule of Appellate Procedure 27(a)(7)(A), which mandates that a brief contain "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record." Accordingly, we conclude that the post-conviction court properly denied the petition for post-conviction relief.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE

- 21 -